UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BRIAN D. HALLA, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|         v. | )   Case No. 15-cv-30021-KAR |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social | ) |
| Security Administration, | ) |
| | ) |
|     Defendant. | ) |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR ORDER
REVERSING THE COMMISSIONER'S DECISION AND DEFENDANT'S MOTION TO
AFFIRM THE DECISION OF THE COMMISSIONER
(Dkt. Nos. 14 & 16)

ROBERTSON, U.S.M.J.

    I.    Introduction

This is an action for judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") regarding Plaintiff's entitlement to Social Security Disability Insurance ("SSDI") pursuant to 42 U.S.C. § 405(g).  Plaintiff Brian D. Halla ("Plaintiff") asserts that the Commissioner's decision denying him such benefits – memorialized in a August 29, 2013 decision by an administrative law judge ("ALJ") – is in error because it is not based on substantial evidence and contains errors of law.  Plaintiff has moved to reverse the Commissioner's decision (Dkt. No. 14) and the Commissioner, in turn, has moved to affirm (Dkt. No. 16).

The parties have consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the following reasons, the court will allow the Commissioner's motion to affirm and deny Plaintiff's motion for an order reversing the Commissioner's decision.

II.   Procedural background

Plaintiff applied for SSDI on July 22, 2011, alleging an April 15, 2010 onset of disability due to degenerative disc disease and torticollis (Administrative Record ("A.R.") at 80, 138-144). The application was denied initially and on reconsideration (*id*. at 80-82, 84-86). Following a hearing on June 19, 2013, the ALJ issued a decision on August 29, 2013, finding that Plaintiff was not disabled and denying Plaintiff's claim (*id*. at 14-34). The Appeals Council denied review (*id*. at 1-6). Thus, the ALJ's decision became the final decision of the Commissioner. This appeal followed.

III.   Discussion

A. Standard of review

The District Court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. *See* 42 U.S.C. § 405(g). Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). The court reviews questions of law *de novo*, but must defer to the ALJ's findings of fact if they are supported by substantial evidence. *See id*. (citing *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir.1999)). Substantial evidence exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion.'" *Irlanda Ortiz v. Sec'y of Health & Human Servs*., 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs*., 647 F.2d 218, 222 (1st Cir. 1981)). In applying

the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *See id*. So long as the substantial evidence standard is met, the ALJ's factual findings are conclusive even if the record "arguably could support a different conclusion." *Id*. at 770. That said, the Commissioner may not ignore evidence, misapply the law, or judge matters entrusted to experts. *See Nguyen*, 172 F.3d at 35.

### B. Standard for entitlement to Social Security Disability Insurance

In order to qualify for SSDI, a claimant must demonstrate that he was disabled within the meaning of the Social Security Act prior to the expiration of his insured status for disability insurance benefits. *See* 42 U.S.C. § 423(a)(1). A claimant is disabled for purposes of SSDI if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated under the statute. *See* 20 C.F.R. § 404.1520. The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3)

whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience. *See id*; s*ee also Goodermote v. Sec'y of Health & Human Servs*., 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process). If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step. *See* 20 C.F.R. § 404.1520.

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's "residual functional capacity" ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work. *See id*. "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis. At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding impairment(s). *See Goodermote,* 690 F.2d at 7.

### C. The ALJ's decision

In determining whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations. At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity from his alleged onset date of April 15, 2010, through December 31, 2012, the date on which he was last insured (A.R. at 19). At steps two and three, the ALJ found

that Plaintiff had certain severe impairments – degenerative disc disease and retrocollis – but concluded that these impairments, taken separately or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*id.* at 19-20). Before proceeding to step four, the ALJ found that Plaintiff had the RFC to perform light work[1] with the following additional limitations: no overhead lifting or reaching; no using ladders, ropes, or scaffolding or working at heights; no more than occasional use of ramps and stairs, stooping, crouching, kneeling, and crawling; no more than incidental exposure to extremes of cold, vibration, or high humidity; and no more than 90 degrees movement to the left or right (*id*. at 20). At step four, the ALJ determined that Plaintiff was able to perform his past work as a supervisor of account clerks as that position would not require the performance of work-related activities precluded by the RFC. The ALJ concluded, therefore, that Plaintiff was not disabled (*id*. at 29).

    D. Plaintiff's objections

Plaintiff's primary claim of error is that the ALJ's failure to give controlling weight to the November 14, 2012 Residual Function Capacity Questionnaire completed by Michael R. Sorrell, M.D., Plaintiff's treating neurologist ("Sorrell RFC"), was not supported by substantial evidence in the record and that the ALJ relied on a legally untenable reason for giving "little weight" to the Sorrell RFC (*id.* at 27-28, 280-287; Dkt. No. 15-1 at 15-16). In a related contention, Plaintiff

---

[1] The Social Security Administration ("SSA") defines light work as work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing light work, [a claimant] must have the ability to substantially all of these activities. If someone can do light work, [the SSA] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567.

5

asserts that the ALJ should not have relied in his decision on the opinions of the two non-treating medical reviewers, each of whom concluded that Plaintiff was not disabled (A.R. at 59-67, 69-78). These related contentions will be addressed in turn.

 1. Dr. Sorrell's opinion

Plaintiff began treating with Dr. Sorrell of Springfield Neurology in October 2005 (*id.* at 267). In the RFC that Dr. Sorrell completed in November 2014, he stated that Plaintiff suffered from cervical dystonia that was stable with treatment (*id*. at 280). According to an article from the Mayo Clinic included in the record, cervical dystonia is also called spasmodic torticollis. It is a painful condition in which the neck muscles contract involuntarily, causing the head to twist or turn to one side or forward or backward. Most people who have cervical dystonia experience neck pain that can radiate into the shoulders. The disorder can also cause headaches. In some people, the pain from cervical dystonia can be exhausting and disabling (*id*. at 275-76).

In his RFC assessment, Dr. Sorrell indicated that Plaintiff had constant neck pain and headaches, at a pain level of 6 out of 10 pre-treatment, and 3 out of 10 after treatment. The pain was said to be precipitated by fatigue, stress, overuse, changing weather, and a static position (*id*. at 281). According to Dr. Sorrell, Plaintiff's pain was sufficiently severe that it would often interfere with attention and concentration and would cause a marked limitation in Plaintiff's ability to deal with stress (*id*. at 283). In Dr. Sorrell's opinion, in a work place, Plaintiff would be able to sit continuously for 45 minutes and for a total of 2 hours each day and stand for 2 hours continuously and for a total of 6 hours per day. He would need to lie down twice a day for 15 minutes at a time (*id.* at 284, 286). Dr. Sorrell estimated that Plaintiff would be absent from work more than three times a month, including partial days (*id.* at 287). The ALJ gave "little

weight" to this opinion because, the ALJ stated, it was inconsistent with the medical evidence of record and with the evidence about Plaintiff's activities of daily living (*id*. at 27).

An ALJ must ordinarily "give more weight to the opinions from [the claimant's] treating physicians, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairments." 20 C.F.R. § 416.927(c)(2).  A treating physician's opinion, however, is only controlling if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Id*.  If the treating physician's opinion is inconsistent with other evidence in the record, the conflict is for the ALJ, not the court, to resolve.  *See Rodriguez*, 647 F.2d at 222.  The ALJ's decision must nevertheless "contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record . . . ." SSR 96–2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Healy v. Colvin*, Civil Action No. 12-30205-DJC, 2014 WL 1271698, at *13-15 (D. Mass. Mar. 27, 2014).  "If the ALJ determines that the treating physician's opinion is not entitled to controlling weight, the ALJ must determine the amount of weight to which the opinion is entitled based on the following six factors: (1) '[l]ength of treatment relationship and the frequency of examination,' (2) '[n]ature and extent of the treatment relationship,' (3) '[s]upportability' of the medical opinion, (4) consistency of the opinion 'with the record as a whole,' (5) '[s]pecialization' of the treating source, and (6) 'other factors . . . that tend to support or contradict the opinion.'" *Healy*, 2014 WL 1271698, at *14 (quoting 20 C.F.R. § 404.1527(c)). An ALJ is not required to discuss each factor under 20 C.F.R. § 404.1527(c).  What is ultimately required is that the ALJ supply good reasons for the weight he assigns to the treating source opinion.  *See id.*

7

Here, "the ALJ did not reject the assessment[] of [Dr. Sorrell] outright." *Arruda v. Barnhart*, 314 F. Supp. 2d 52, 71 (D. Mass. 2004) (citing *Keating v. Sec. of Health & Human Servs.*, 848 F.2d 271, 276 (1st Cir. 1988)).  He declined to give Dr. Sorrell's opinion controlling weight because, in his view, it was inconsistent with the medical evidence of record, including Dr. Sorrell's treatment records, and with the evidence about Plaintiff's daily activities (A.R. at 27).  The ALJ's finding that Dr. Sorrell's assessment was inconsistent with medical evidence in the record was reflected in the ALJ's longitudinal review of Plaintiff's medical records (*id.* at 21-28).  That medical evidence included Dr. Sorrell's treatment notes, which regularly showed that Plaintiff's condition improved substantially with Botox injections (*id.* at 24-27, 243, 245, 248, 252, 312, 316, 320).[2]  In addition, Gary Jacobsen, D.O., Plaintiff's primary care physician, noted on March 17, 2011 that Plaintiff's health was good, and that Plaintiff was observed to be in no acute distress and appeared well.  Dr. Jacobsen made no note of any back or neck abnormalities (*id.* at 24, 288-306).  On August 16, 2012, Dr. Jacobson again noted that Plaintiff's health was good, and that he was observed to be in no acute distress.  Again, Dr. Jacobsen made no note of any back or neck abnormalities (*id.* at 26).  Dr. Jacobsen also noted that Plaintiff exercised three times or more per week and that his exercise included walking (*id.* at 26, 288-306).

---

[2] On July 26, 2010, Plaintiff's neck pain was noted by Dr. Sorrell to be under good control with a previous round of Botox (A.R. 24, 252). On January 28, 2011, Dr. Sorrell noted that Plaintiff had good relief from neck pain for at least eight weeks after a previous round of Botox (*id.* at 24, 248). Dr. Sorrell noted that on May 2, 2011, Plaintiff had good relief of the neck and shoulder pain and demonstrated a good range of motion (*id.* at 25, 245). On August 2, 2011, Dr. Sorrell noted that Plaintiff had a good response to Botox and that he did not have neck or shoulder cramping and only had mild neck discomfort throughout the entire period of the benefit of the Botox (*id.* at 25, 243). On May 11, 2012, Dr. Sorrell noted improvement with previous Botox injections (*id.* at 26, 320). On November 12, 2012, Dr. Sorrell noted Plaintiff experienced temporary improvement of pain and reduced discomfort and dystonia with previous Botox injections (*id.* at 26, 316). On November 14, 2012, Dr. Sorrell noted that Botox had reduced the severity of the neck and shoulder ache (*id.* at 27, 312).

The ALJ's summary of Plaintiff's daily living activities was based on his review of Plaintiff's response to a written questionnaire as well as Plaintiff's hearing testimony (*id*. at 21, 22-23, 174-81). In the questionnaire, Plaintiff indicated that he lived alone and was able to perform all of the activities required to care for himself and his condominium (*id.* at 174-77). Asked about limitations attributable to his condition, he indicated that he could no longer sit and work at a computer, desk or table "for extended periods," could not perform overhead lifting and could no longer engage "in most athletic activities" (*id.* at 175). His hobbies and interests included going to a fitness center, dining out and going to movies with friends, taking trips monthly or quarterly, and walking. Because of his condition, he had had to give up golf, reduce weight training significantly, and spend shorter times sitting (*id.* at 178). At the hearing, Plaintiff testified to neck pain at a baseline of 3 to 4 out of 10 that varied throughout the day and for which he did not take pain medication with the exception of periodic reliance on Ibuprofen (*id*. at 43-44). He testified that he could dress and groom himself, walk five miles two days per week, and had recently traveled by air to California to visit family and friends (*id*. at 23). The ALJ reasonably could conclude "that these activities buttressed a finding, based on the evidence as a whole, that the plaintiff was capable of performing work activities on a regular and continuing basis[.]" *Field v. Barnhart*, No. 05-100-P-S, 2006 WL 549305, at *6 (D. Me. Mar. 6, 2006) (Report and Recommended Decision); *see also Aubaker v. Astrue*, Civil Action No. 1:11-cv-10456-DJC, 2012 WL 957623, at *9 (D. Mass. Mar. 21, 2012) (ALJ properly relied on claimant's testimony about his activities and symptoms). Taken as a whole, the evidence on which the ALJ relied, including medical records and Plaintiff's accounts of his daily activities, can be viewed as corroborating Plaintiff's ability to engage in light exertional activity with the additional restrictions imposed by the ALJ in his RFC assessment. *See, e.g., Healy*, 2014 WL

1271698, at *14; *Aubaker*, 2012 WL 957623, at *9-10 (ALJ has discretion to assign weight to medical opinions based on consistency with overall record).

Plaintiff rightly criticizes the ALJ for the following observation:

> The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality that should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's request and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence in the record, as in the current case.

(A.R. at 27-28). There is no evidence in the record to support these speculative musings and no apparent basis for the ALJ's criticism of Dr. Sorrell. *See Rodriguez v. Astrue*, 694 F. Supp. 2d 36, 43 (D. Mass. 2010). "In analyzing a treating physician's report, the ALJ cannot substitute his own judgment for competent medical opinion,' nor can he set his expertise against that of a physician who submitted an opinion.'" *Gilbert v. Apfel*, 70 F. Supp. 2d 285, 290 (W.D.N.Y 1999) (quoting *Balsamo v. Chater*, 143 F.3d 75, 81 (2d Cir. 1998)). Notwithstanding an inappropriate observation, however, an ALJ's opinion "can still pass muster if the other reasons given to accord medical reports little weight are adequately supported." *Arroyo v. Barnhart*, 295 F. Supp. 2d 214, 221 (D. Mass. 2003). Here, the ALJ adequately explained his reasons for giving little weight to those aspects of Dr. Sorrell's opinion that supported an inability to engage in any substantial gainful activity as opposed to supporting limitations on Plaintiff's residual functional capacity, and he relied on the totality of the record evidence in crafting his RFC assessment. Accordingly, although the record arguably could support a different conclusion, this court must defer to the ALJ's finding. *See Irlanda Ortiz*, 955 F.2d at 770.

    2. <u>Agency medical reviews</u>

The ALJ noted that in reaching his conclusion about the severity of Plaintiff's impairment and the resulting limitations, he had assigned "some, but not great weight" to the opinions of Dr. Robin McFee, D.O., and Erik Purins, M.D., both state medical examiners who reviewed Plaintiff's medical records for the state Disability Determination Service (A.R. at 28-29).  Dr. McFee reviewed Plaintiff's records through April 2, 2012, concluding that, while the medical record established degenerative disc disease and torticollis causing chronic neck and shoulder pain with resulting functional limitations, Plaintiff was not disabled (*id.* at 28, 59-67). Dr. Purins reviewed Plaintiff's records through September 14, 2012.  He too concluded that the medical records established degenerative disc disease and cervical dystonia causing chronic neck and shoulder pain (*id*. at 74).  Dr. Purins also opined that, while Plaintiff had functional limitations, he was not disabled (*id.* at 74-76, 78).  Plaintiff asserts that the ALJ erred by giving any weight to the opinions of these non-treating and non-examining physicians because they did not consider the entire record that was before the ALJ, and neither was a neurologist (Dkt. No. 15-1 at 12-14).  He further asserts that the ALJ erred because, having rejected Dr. Sorrell's RFC, he was left to analyze the contents of the record on his own without benefit of a reviewer's report.  There was no error.

Notwithstanding Plaintiff's criticism of Drs. McFee and Purins, SSR 96-6p – cited by the ALJ – provides that "[b]ecause State agency medical . . . consultants and other program physicians . . . are experts in the Social Security disability programs, the rules in 20 CFR 404.1527(f) and 416.927(f) require administrative law judges and the Appeals Council to consider their findings of fact about the nature and severity of an individual's impairment(s) as opinions of nonexamining physicians and psychologists."  SSR 96-6p, 1996 WL 374180, at *1 (July 2, 1996).  "The written opinion of a non-examining, non-treating physician will be

considered substantial evidence if it is supported by other evidence in the record." *Howard v. Colvin*, 54 F. Supp. 3d 109, 119 (D. Mass. 2014) (citing *Tremblay v. Sec'y of Health & Human Servs.*, 676 F.2d 11, 13 (1st Cir. 1982)). "[T]he First Circuit has held that medical evidence too far removed from the relevant time period may not be utilized to serve as substantial evidence if there is an indication in the more recent records that there has been a significant change in the claimant's condition." *Aubaker*, 2012 WL 957623, at *12 (citing *Soto-Cedeno v. Astrue*, 380 Fed. Appx. 1, 2 (1st Cir. 2010)). "The ALJ may rely on older information if that evidence remains accurate." *Id.* (citing *Ferland v. Astrue*, No. 11-cv-123-SM, 2011 WL 5199989, at *4 (D.N.H. Oct. 31, 2011)).

In *Chelte v. Apfel*, 76 F. Supp. 2d 104 (D. Mass. 1999), on which Plaintiff relies, District Judge Michael Ponsor held that where non-examining DDS physicians had only reviewed a partial record and had not seen "vital information contained in the unreviewed portion . . . their report, while noteworthy, [could not] be the sole factor in determining disability." *Id.* at 108. In *Chelte*, the information not available to the reviewing DDS physicians established that the claimant had a listed impairment and was, therefore, disabled. *Chelte*, 76 F. Supp. 2d at 108. Here, neither reviewing physician considered records of Plaintiff's treatment with Dr. Sorrell on November 12 and 14, 2012 and February 11, 2013; a purported consultation with Tony Tannoury, M.D., an orthopedic surgeon, on January 18, 2013;[3] and with Dr. Jacobsen, Plaintiff's

---

[3] The record does not contain any record from Dr. Tannoury's office of a January 18, 2013 appointment with Plaintiff. Rather it contains what purports to be a summary by Plaintiff of a January 18, 2013 consultation with Dr. Tannoury concerning the status of Plaintiff's degenerative disc disease (A.R. at 307-08). There is no evidence in the record showing that Plaintiff was disabled by degenerative disc disease prior to December 31, 2012. Indeed, Plaintiff's summary of his consultation with Dr. Tannoury represents that Dr. Tannoury had informed him that immediate surgery was not recommended and would not be recommended unless Plaintiff developed persistent radicular symptoms or suffered from a reduced quality of life (*id.* at 308).

primary care provider, on January 10, 2013.  Unlike *Chelte*, this is not a case where "vital information" establishing a new diagnosis and showing that Plaintiff's impairments met or equaled a listed impairment was unavailable to the DDS reviewers.  *See id*.  Plaintiff's diagnoses remained consistent before and after the DDS reviews: cervical dystonia, or torticollis, and degenerative disc disease (A.R. 64, 74, 289, 304).  To the extent Plaintiff's contention is based on the fact that the ALJ did not review all of Dr. Sorrell's treatment notes, those notes remained consistent:  Plaintiff had cervical dystonia with chronic neck pain or ache that improved temporarily and to varying degrees with Botox injections, which were administered approximately every 90 days (*id.* at 309-30).   The ALJ was required to consider the opinions of the nonexamining physicians, and these records, which were not far removed in time from the relevant period, constituted substantial evidence on which the ALJ properly could rely, as he did. *See Howard*, 54 F. Supp. 3d at 119; *Aubaker*, 2012 WL 957623, at *12; *Field*, 2006 WL 549305, at *5 (where progress note not available to reviewing physician was consistent with contents of previous notes, ALJ was entitled to rely on reviewing physician's RFC as substantial evidence).

      The non-examining physicians assessed Plaintiff's RFC in identical terms (A.R. at 63-65, 74-76). Each concluded that Plaintiff had exertional limitations, including limitations on the amounts he could lift.  Each concluded that he could stand or walk (with normal breaks) for up to 6 hours in an 8-hour work day and sit (with normal breaks) for about 6 hours in an 8-hour work day.  They concluded that he had some postural limitations, including limited ability to reach overhead; and each assessed certain environmental limitations (*id.*).  In concluding that Plaintiff was capable of light work with additional restrictions, the ALJ adopted the RFC assessments of the DDS physicians, except that he concluded that Plaintiff was limited to work that required no overhead lifting or reaching (rather than limited overhead reaching).  The ALJ also concluded,

13

unlike the DDS reviewers, that Plaintiff was limited to no more than occasional stooping, kneeling, and crouching; needed to avoid anything more than incidental exposure to extremes of cold, vibration, or high humidity; and required a job where he was not required to turn more than 90 degrees to the left or right (A.R. at 20, 63-65, 74-76).

Plaintiff's contention that the ALJ improperly interpreted raw medical data is misplaced. "Although the principle that the ALJ cannot interpret raw medical data is correct . . . there are [two] physical RFC[s] that support[] and, in fact, [go] beyond the ALJ's more conservative findings." *Arruda*, 314 F. Supp. 2d at 74; *contrast Manso-Pizarro v. Sec. of Health & Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996) (ALJ not qualified to interpret raw medical data; record contained no analysis of functional capacity by physician or other expert); *Perez v. Sec. of Health & Human Servs.*, 958 F.2d 445, 336 (1st Cir. 1991) (ALJ not qualified to interpret raw medical data; record contained no medical evaluation of claimant's residual functional capacity). Indeed, the record in the instant case contained three residual functional capacity evaluations. The ALJ did not reject the Sorrell RFC outright and he adequately explained his reasons for giving it "little weight." Plaintiff's last insured date was December 31, 2012 (A.R. at 19). Dr. McFee's RFC was prepared in mid-April 2012 (*id.* at 67); Dr. Purins's in mid-September 2012 (*id.* at 78). Their reports were prepared during the relevant period, and no new and vital information developed thereafter. Plaintiff has no basis for an objection to the RFC assessment crafted by the ALJ when it was more conservative than the recent RFC assessments of non-examining reviewing physicians on which the ALJ was entitled to rely. *See Arruda*, 314 F. Supp. 2d at 74.

    IV.    <u>Conclusion</u>

For the reasons stated above, Plaintiff's motion for order reversing the Commissioner's decision (Dkt. No. 14) is DENIED, and the Commissioner's motion to affirm the decision (Dkt. No. 16) is GRANTED.

It is so ordered.

Dated: January 20, 2016  /s/ Katherine A. Robertson
KATHERINE A. ROBERTSON
United States Magistrate Judge